## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Eric Andrew Wong,                                    **Civil No. 11-cv-176 (JNE/SER)**

       Plaintiff,

v.                                                   **<u>REPORT AND RECOMMENDATION</u>**

Michael J. Astrue,
Commissioner of Social Security,

       Defendant.

---

David L. Christianson, Esq., Social Security Disability Law Center, 1201 Marquette Avenue South, Suite 110, Minneapolis, Minnesota 55403, on behalf of Plaintiff.

Lonnie Bryan, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Eric Andrew Wong ("Wong") seeks review of the Commissioner of Social Security Michael J. Astrue's ("Commissioner") denial of Wong's application for Social Security Disability Insurance ("SSDI") and Social Security Income ("SSI"). This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and the District of Minnesota Local Rule 72.1. The parties filed cross-motions for summary judgment [Doc. Nos. 12 and 15]. For the reasons set forth, the Court recommends Wong's motion for summary judgment be granted in part and denied in part, and the Commissioner's motion be denied.

# I.     BACKGROUND

## A.            Procedural History

Wong applied for SSDI and SSI in October 2006.  (Admin. R. at 125, 145) [Doc. No. 7]. In both applications, he alleged a disability onset date of September 30, 2005.  (*Id.* at 119, 125, 145).  The applications claimed disability due to the following impairments: (1) Ehlers-Danlos syndrome[1] ("EDS") with chronic fatigue, (2) postural orthostatic tachycardia syndrome[2] ("POTS") with chronic fatigue, (3) scoliosis, (4) spondylolisthesis[3], (5) hypertension, (6) hyperlipidemia[4], (7) lifelong chronic diarrhea of unknown cause, (8) chronic leukocytosis[5] of unknown cause, and (9) bilateral ulnar neuropathy[6].[7]  (*Id.* at 13, 150, 161); (Pl.'s Mem. in Supp. of Mot. for Summ. J.) [Doc. No. 13, at 2].  These impairments allegedly prevented Wong from obtaining gainful employment.  (Admin. R. at 150–51).

Wong's applications were denied initially on November 15, 2006, and again upon reconsideration on July 17, 2007.  (*Id.* at 60–70, 72–73, 74–81).  Wong requested a hearing.  (*Id.*

---

[1]     Ehlers-Danlos syndrome is a group of connective tissue disorders characterized by hyperelasticity and fragility of the skin, hypermobility of the joints, and fragility of blood vessels, and sometimes large arteries due to deficient quality or quantity of collagen.  *Stedman's Medical Dictionary*, Ehlers-Danlos syndrome, (27th Ed. 2000).

[2]     POTS is a disorder characterized by the body's inability to make the necessary adjustments to counteract gravity when standing up.  *Stedman's Medical Dictionary*, Ortostatic tachycardia, (27th Ed. 2000).

[3]     Spondylolisthesis is a condition in which a vertebra in the lower part of the spine slips out of the proper position onto the bone below it.  *Stedman's Medical Dictionary*, Spondylolisthesis, (27th Ed. 2000).

[4]     Hyperlipidemia is the presence of an abnormally high concentration of lipids in the circulating blood.  *Stedman's Medical Dictionary*, Hyperlipidemia, (27th Ed. 2000).

[5]     Leukocytosis is an abnormally large number of leukocytes, as observed in acute infections, inflammation, hemorrhage, and other conditions.  An elevated white blood cell count usually indicates leukocytosis.  *Stedman's Medical Dictionary*, Leukocytosis, (27th Ed. 2000).

[6]      Bilateral ulnar neuropathy is nerve damage to both arms at the elbow.  *Stedman's Medical Dictionary*, Neuropathy, (27th Ed. 2000).

[7]     This list is based on the narrative included with Wong's application, the ALJ's findings, the hearing transcript, and the record.

at 11, 83). Administrative Law Judge David B. Washington ("the ALJ") heard the matter on August 27, 2009. (*Id.* at 22–55, 97–101, 102–06). On October 13, 2009, the ALJ issued an unfavorable decision. (*Id.* at 8–20). The Appeals Council denied Wong's request for a review of the ALJ's decision on December 1, 2010. (*Id.* at 1–6). The denial of further review rendered the ALJ's decision final. *See* 42 U.S.C. § 405(g); *Wilburn v. Astrue*, 626 F.3d 999, 1002 (8th Cir. 2010); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981. Wong seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### B.      Plaintiff's Testimony

As of the date of the hearing, Wong was a forty-year-old man. (*Id.* at 24). He completed several years of college. (*Id.* at 25). His prior work experience consisted of employment as an injection mold operator and most recently as a self-employed computer technician. (*Id.* at 27, 35, 36). Wong testified his symptoms were so debilitating in September 2005 that his computer company failed because he could no longer physically manage the work. (*Id.* at 35–37). Wong has been unemployed since September 2005. (*Id.* at 38).

Wong testified he has had EDS and POTS all his life.[8]   (*Id.* at 26). He describes his EDS and POTS symptoms as opposing one another: The more physical activity he engages in, the more pain and weakness he feels in his muscles and joints from EDS. (*Id.* at 25). The less active he is, the more severe the POTS symptoms become.[9]  (*Id.* at 25–26).

---

[8]      According to the medical records, Wong's EDS diagnosis was in December 2006 and POTS in 2009. (*Id.* at 341, 684). At the hearing, Wong testified his EDS diagnosis was in 2007. (*Id.* at 30). The ALJ noted 2007 as the year of diagnoses for EDS and POTS. (*Id.* at 14).

[9]      His POTS symptoms include orthostatic intolerance and dizziness, resulting in cognitive impairment. (*Id.* at 26).

During high school, Wong was often absent because of his symptoms.  (*Id.* at 26). Nevertheless, he achieved high marks and graduated with a GED.  (*Id.*).  After high school, Wong worked in a plastics factory as an injection mold operator for less than two years.  (*Id.* at 27, 35).  His job attendance was poor.  (*Id.* at 35).  He missed several days and once called in sick for over a month.  (*Id.*).  After that absence, he returned to work for several months before quitting.  (*Id.*).  At some point, the company reassigned him to a different, less strenuous position.  (*Id.* at 35–36).  Wong quit the job because, despite the position change, he was still unable to physically perform the job.  (*Id.* at 35).

After he quit the plastics factory, Wong went to college "to get a sit-down job."  (*Id.* at 27).  In college he continued to struggle with attendance albeit claims to have earned "good" grades.  (*Id.* at 26).  Due to his many absences, the school lowered his grade point average from a 4.2 to a 3.9 at graduation.  (*Id.*).

After college, he started his own computer servicing company, which primarily designed, built, and repaired computer systems.  (*Id.* at 27, 36).  In 1997, his highest earning period, he had employees and a storefront location.  (*Id.* at 36).   The company continued to be profitable through 2002.[10]  (*Id.*).

Wong became unable to handle the physical demands of his company and started giving up jobs.  (*Id.* at 36).  At first, he only turned away jobs that required him to work from the client's location.  (*Id.* at 36–37).  Wong testified his condition continued to worsen, and by September 2005 he could not stand without passing out.  (*Id.* at 27).  He was unable to finish simple jobs in a reasonable period.  (*Id.* at 27, 37).  His company failed.  (*Id.*).  Wong began

---

[10]     There were no earnings for 2003, 2004, and 2005.  (*Id.* at 37).  Wong contends this is because his earnings were so negligible he was not required to file.  (*Id.*).

seeing a doctor to determine the cause of his symptoms. (*Id.* at 37–38). He has not engaged in "any other work activities" since October 2005. (*Id.* at 38).

Wong testified his computer abilities have also been limited significantly since 2006. (*Id.* at 52). He testified that it is "hard" for him to stay in the seated position at the computer. (*Id.*). He also said that nerve damage in his right hand causes it to seize up and cramp, so he has a difficult time using a mouse or typing. (*Id.*). According to Wong, it takes him all day to type a short paragraph because he is limited to one-handed typing and must take frequent breaks to lie down and rest his arm. (*Id.*). Similar problems exist when he writes with a pen or pencil. (*Id.* at 53).

It takes Wong a few hours to "get going" in the morning. (*Id.* at 29). His days start between 9:00 a.m. and the early afternoon. (*Id.*). For a number of years, Wong spent most of his days lying down, his "default position." (*Id.* at 27–28, 30, 32).

Wong must divide his chores into smaller tasks to complete them. (*Id.* at 30). He works to complete the task until he feels "endangered" by one of his symptoms. (*Id.*). At that point, he lies down until he is well enough to resume. (*Id.*). He uses this method of "pacing himself" for simple, daily tasks. (*Id.*). For example, shaving in the morning often requires Wong to take several breaks. (*Id.*). In addition, he experiences ten to twelve bowel movements per day. (*Id.* at 32). Wong does not drive. (*Id.* at 25).

On the day of the hearing, Wong's medication included atenolol[11] daily and tramadol[12] as needed for pain. (*Id.* at 40). Wong explained his pain medication makes him sick, so he took it

---

[11]     Atenolol is a relatively cardioselective beta-adrenergic blocking agent used primarily in the treatment of angina pectoris and hypertension. *Stedman's Medical Dictionary*, Atenolol, (27th Ed. 2000).
[12]     Tramadol is medication used to relieve pain. *Stedman's Medical Dictionary*, Tramadol, (27th Ed. 2000).

infrequently and in small doses.  (*Id.*).  He testified he could not recall a pain-free day in his life and stated that his body pain usually ranged between three and eight on a ten-point scale, averaging about five or six.  (*Id.*).  Almost every day for the last several years, though, he has had localized pain somewhere in his body with a rating of eight.  (*Id.*).

At the time of the hearing, Wong was attempting physical therapy.  (*Id.* at 39).  He testified that almost every therapy session results in at least one subluxation[13] of a joint.  (*Id.*). He also testified that he dislocated major joints in the preceding year.  (*Id.*).

Wong identified joint subluxation or dislocation as a primary symptom of EDS.  (*Id.* at 34).  Wong's most frequently subluxed or dislocated joints were his elbows, shoulders, knees, hips, ankles, and fingers.  (*Id.*).  When a joint becomes dislocated totally, Wong is able to pop it back in himself with physical manipulation generally.  (*Id.*).  Larger joints, like his hips, however, may require someone else to help.  (*Id.*).

Wong testified that EDS also results in joint pain.  (*Id.* at 33).  This pain is worse in load-bearing joints, specifically his ankles, knees, hips, spine, and shoulders.  (*Id.*).  Wong added that his elbows were also painful because those joints are hypermobile and nerves may become pinched.  (*Id.* at 33–34).  Wong had surgery on his right elbow to move the nerve to avoid pinching; he reports only mediocre success.  (*Id.* at 34).

POTS is "the second half of [his] symptoms."  (*Id.* at 31).  Wong described his POTS symptoms as feeling like congestive heart failure.  (*Id.*).  He asserted the standard of living for someone with POTS is comparable to that of someone with congestive heart failure.  (*Id.*).

---

[13]     Subluxation is an incomplete luxation or dislocation; though a relationship is altered, contact between joint surfaces remains.  *Stedman's Medical Dictionary*, Subluxation, (27th Ed. 2000).

According to Wong, he is able to walk only about a one-quarter to one-half a city block and does not have the physical tolerance to stand all day. (*Id.* at 28, 32). He can stand for "it seems as long as it's necessary to a point . . . until [he] really cannot stand up anymore." (*Id.* at 28). Frequently changing positions helps, but after about ten to fifteen minutes, he becomes too dizzy to continue standing. (*Id.* at 28, 32). Wong explained that when he stands, gravity pulls his blood to his lower extremities, causing his veins to stretch and allowing blood to pool. (*Id.* at 33). Because of the pooling, other organ systems, including his brain, receive inadequate blood flow. (*Id.*). Wong testified that he must lie down for the majority of the day to allow sufficient blood flow to all his organs. (*Id.* at 32).

Wong testified that sitting causes immediate pain. (*Id.* at 27). In addition, "well within a half hour" of sitting, Wong becomes physically weak and dizzy. (*Id.*).

Wong has "lots of problems with lifting." (*Id.* at 28). He testified he must be careful not to overexert himself or strain too hard to avoid popping a bone out of joint. (*Id.* at 29). When asked how much he could lift without hurting himself, Wong stated "[e]verything is painful." (*Id.* at 29). He reported pain when lifting his arm without anything in his hand. (*Id.*). He is not certain about the weight at which the risk of dislocation becomes too great. (*Id.*). Bending and maneuvering to pick something up are also difficult for Wong. (*Id.*). In addition to the pain and weakness he experiences, there is also a risk that he could pass out if he returns to an upright position too quickly because of his POTS. (*Id.*).

Wong does not believe he is capable of working a full-time job, even if the job allowed him to sit, stand, or alternate. (*Id.* at 38). He cites the duration of an eight-hour workday as the main problem and states "[i]t's just too long of a period of time to attempt to do anything." (*Id.*). He said he "pays for" anything he does with rest and recuperation time; after any activity, he

must spend the equivalent period recuperating from it.  (*Id.*).  For example, Wong testified that because he traveled to and attended the ALJ hearing, he would spend "the next couple of days" recovering and unable to do anything.  (*Id.* at 38–39).

### C.      Medical Evidence

#### 1.      Medical Records Predating EDS Diagnosis

The medical records begin after Wong's alleged onset date.[14]  On October 7, 2005, Wong visited the Hennepin County Medical Center ("HCMC") and saw Holly Melroe, CNP ("CNP Melroe") to establish primary care and complaining of chest pain.  (*Id.*).  Prior to this date, he had never been treated for cardiac or pulmonary problems.  (*Id.*).  He reported that about six weeks earlier he woke up with severe sternal pain, felt weak, had a headache, and experienced shortness of breath and vertigo.  (*Id.*).  The chest pain persisted at no higher than three on a scale of one-to-ten and was constantly present.  (*Id.*).  His gait was normal and Wong did not appear to be in acute distress.  (*Id.* at 494–95).  Imaging of his chest was normal, but Wong received a prescription for lisinopril[15] to help reduce his blood pressure.[16]  (*Id.* at 495, 528).

One week later, Wong returned to HCMC with continued chest pain at a steady rating of two or three on a ten-point scale.  (*Id.* at 496).  Wong reported ongoing fatigue, drowsiness, and vertigo.  (*Id.*).  He also complained of hypertension, headaches shortly after taking his lisinopril,

---

[14]      The record contains references to Wong's history of polysubstance dependency.  He reported abusing crack cocaine, methamphetamine, marijuana, heroin, LSD, mescaline, and other hallucinogens until 1996.  (*Id.* at 494).  The record contains references to Wong's use of marijuana.  (*Id.* at 267, 562, 575, 578, 621, 678).  As the ALJ noted, however, "[t]here are no functional limitations related to these issues.  He has been in long term remission from poly substance abuse."  (*Id.* at 17).

[15]      Lisinopril is an angiotensin-converting enzyme inhibitor used in the treatment of hypertension. *Stedman's Medical Dictionary*, Lisinopril, (27th Ed. 2000).

[16]      Wong's blood pressure measured hypertensive at 166/105.  (*Id.* at 494).  Hypertension has been arbitrarily defined as a systolic blood pressure above 140 mm Hg or a diastolic blood pressure above 90 mm Hg. *Stedman's Medical Dictionary*, Hypertension, (27th Ed. 2000).

episodic back pain, rectal bleeding about once a month, and elevated cholesterol. (*Id.*). He was more active than the previous week, but not able to work or do daily errands. (*Id.*). A complete blood count ("CBC") revealed an elevated white count, suggesting some kind of infection or disease. (*Id.* at 497). An electrocardiogram ("EKG") did not expose any cardiac irregularity. (*Id.* at 496–97). Nevertheless, CNP Melroe prescribed hydrochlorothiazide[17] to help with chest pains. (*Id.* at 497). She also encouraged Wong to modify his diet and exercise more often. (*Id.*).

The following week, Wong reported his fatigue and chest pain improved, but he continued to have a dull, aching sensation. (*Id.* at 498). Wong was noncompliant with his hypertension medications. (*Id.* at 499). CNP Melroe ordered a chest computed tomography ("CT") and a purified protein derivative ("PPD") to determine the cause of Wong's chest pain. (*Id.* at 499). Both were unremarkable. (*Id.* at 500, 529). CNP Melroe concluded Wong's chest pain "symptoms have been improving." (*Id.* at 499). Another CBC revealed that Wong's white count was still elevated. (*Id.* at 498). CNP Melroe rated Wong's upper and lower extremity strength at greater than four on a five-point scale and noted his hand grasps were equal and strong. (*Id.* at 499).

Wong did not return to the doctor for three months. (*Id.* at 315, 500). At that time, he reported compliance with his hypertension medications and his blood pressure was within reasonable range. (*Id.*). He reported experiencing two episodes of chest pain in the preceding month, each lasting about a day. (*Id.*). He complained of significant fatigue that prevented him from working. (*Id.*). Wong was also unable to walk more than two blocks without requiring a rest because of his fatigue. (*Id.*). In addition, Wong complained he had frequent loose stools. (*Id.*). Since his last visit, Wong had modified his diet in relation to his elevated cholesterol. (*Id.*

---

[17]     Hydrochlorothiazide is a potent, orally effective diuretic and antihypertensive agent. *Stedman's Medical Dictionary*, Hydrochlorothiazide, (27th Ed. 2000).

at 316, 501).  Wong did not appear to be in any acute distress.  (*Id.*).  His hand grasps were equal and strong, and his lower extremity strength measure greater than three on a five-point scale. (*Id.*).  CNP Melroe thought a side effect to or intolerance of hydrochorothiazide could be the cause of Wong's reported diarrhea.  (*Id.* at 312, 316, 501–02).  She instructed Wong to stop taking it and increased his lisinopril to 20 mg.  (*Id.* at 312, 316, 501–02).  Given his past chemical dependency drug use and present persistent fatigue, decreased stamina, and episodes of chest pain, an echocardiogram was ordered.  (*Id.* at 316, 501).  The echocardiogram revealed no significant problems, but did demonstrate trace mitral valve insufficiency.[18]  (*Id.* at 261, 312, 502).

In mid-February, Wong called HCMC complaining of numbness in the fourth and fifth digits of his right hand.  (*Id.* at 312).  During that call, he was instructed to decrease his lisinopril from 20 mg to 10 mg daily.  (*Id.*).  About a week later, Wong saw CNP Monroe for the continued numbness in his digits.  (*Id.* at 312, 502).  Although his hand grasps remained equal, CNP Melroe noted a somewhat limited range of motion in the fourth and fifth digits of Wong's right hand.  (*Id.* at 312, 314, 502, 503).  Hypothesizing a possible trigger finger[19] due to an inflamed nerve, CNP Melroe prescribed naprosyn.  (*Id.* at 314).  Wong reported compliance with his hypertension medications.  (*Id.* at 312, 502).  He also reported regularly checking his blood pressure at home and recording results of about 140 over 80 to 90.  (*Id.*).  He did not report any additional chest pain, but CNP Melroe instructed him to stop the lisinopril and begin 50 mg daily

---

[18]     Mitral valve insufficiency, or mitral valve regurgitation, occurs when there is a reflux of blood through an incompetent mitral valve. *Stedman's Medical Dictionary*, Mitral regurgitation, (27th Ed. 2000).

[19]     Trigger finger is a condition in which the movement of the finger is arrested for a moment in flexion or extension and then continues with a jerk. *Stedman's Medical Dictionary*, Trigger finger, (27th Ed. 2000).  It results from localized swelling of the tendon that interferes with its gliding through the pulleys in the palm of the hand. *Id.*

of atenolol.  (*Id.* at 312, 502).  Wong related his diarrhea problem was much better.  (*Id.* at 312, 503).  Wong complained his chronic fatigue continued preventing a return to work.  (*Id.* at 314, 503).  CNP Melroe ruled out cardiac and respiratory causes for Wong's chronic fatigue.  (*Id.* at 314).

Given Wong's complaints of significant fatigue and other varied symptoms, CNP Melroe transferred him to Dr. Richard Granger ("Dr. Granger") for primary care.  (*Id.* at 311–12).  On April 11, 2006, Wong had a blood pressure check which averaged at 162 over 100.  (*Id.* at 309).  Wong stated for the past nine months he occasionally experienced chest pain.  (*Id.*).  He referred to the pain as a "twinge" and was not willing to assign a number value on the pain scale because it was so insignificant.  (*Id.*).  Wong reported experiencing dizziness when quickly changing positions, but had rapid recovery and no headaches or shortness of breath.  (*Id.* at 311).  Wong also reported some hand weakness, especially on the right.  (*Id.* at 309, 311, 505).  An electromyogram ("EMG") revealed ulnar neuropathy in his right arm.  (*Id.* at 307, 309, 311, 505–506).  Dr. Granger increased his atenolol to 100 mg daily.  (*Id.* at 311).

In April, Wong complained of continued chronic and ongoing generalized fatigue, but an extensive work up revealed nothing.  (*Id.* at 307).  Wong also reported hand weakness and numbness, which was worse on the right.  (*Id.* at 309).  Wong did not have any cardiac or respiratory complaints.  (*Id.*). In May, Wong reported his fatigue improved and Dr. Granger noted it "appear[ed] to be resolving recently."  (*Id.*  at 301).  Dr. Granger further noted medication adequately controlled his hypertension and that his chronic diarrhea was resolved.  (*Id.*).

On May 15, 2006, Wong saw Dr. Eric R. Nelson ("Dr. Nelson") for his right ulnar neuropathy.  (*Id.* at 303).  Dr. Nelson noted Wong habitually held "his right hand in a mild ulnar

claw" position, although he was able to correct this posture. (*Id.* at 305). Dr. Nelson also noted a positive Wartenberg symptom.[20] (*Id.*). Results from an EMG taken on April 11, 2006 were consistent with acute ulnar neuropathy. (*Id.*). Dr. Nelson recommended an ulnar nerve decompression/transposition surgery. (*Id.*). The surgery was performed on September 1, 2006. (*Id.* at 283). At his five-month follow up, Wong reported being "extremely happy" with the outcome. (*Id.* at 357).

On June 14, 2006, hematologist Dr. Rachel Lerner ("Dr. Lerner") met with Wong regarding his leukocytosis. (*Id.* at 297). Wong reported that when his elevated white count was first recorded in October 2005, he had significant fatigue, but this had improved. (*Id.* at 207, 297). Wong reported some occasional diarrhea but a good appetite. (*Id.* at 207, 297). Dr. Lerner commented that Wong had "a good work up to date" and concluded that his leukocytosis was "likely reactive in nature." (*Id.* at 299). On July 5, 2006, Wong again saw Dr. Lerner. (*Id.* at 293). Dr. Lerner noted Wong's blood draws from the last visit were "unremarkable" and reassured Wong she found nothing in his examination or laboratory workup. (*Id.*).

A little more than a month later, Wong reported generalized fatigue, shortness of breath on exertion, chest pain, low back pain, and multiple joint pain and hypermobility. (*Id.* at 289). Wong suggested Marfan syndrome[21] as a possible explanation for his medical issues based on his family history. (*Id.*). Dr. Granger observed some clinical findings consistent with Marfan syndrome, but concluded further research was necessary. (*Id.* at 287, 289). Consequently, Dr.

---

[20]    A Wartenberg symptom is the flexion of the thumb when the patient attempts to flex the four fingers against resistance. *Stedman's Medical Dictionary*, Wartenberg symptom, (27th Ed. 2000).

[21]    Marfan syndrome is a connective tissue multisystemic disorder characterized by skeletal changes (arachnodactyly, long limbs, joint laxity, pectus), cardiovascular defects (aortic aneurysm which may dissect, mitral valve prolapse), and ectopia lentis. *Stedman's Medical Dictionary*, Marfan syndrome, (27th Ed. 2000).

Granger ordered imaging tests to evaluate Wong's cardiac and respiratory systems for symptoms consistent with Marfan syndrome. (*Id.* at 289). A CT of Wong's chest was unremarkable. (*Id.* at 255, 285, 519, 530). A stress test was negative for valvular abnormalities and other cardiac pathology under stress, despite Wong's complaints of increased chest pain. (*Id.* at 285, 519).

On August 15, 2006, Wong complained of diffuse somatic[22] pain and, upon request, received a referral to the Mayo Clinic for his tentative Marfan syndrome diagnosis. (*Id.* at 285). Dr. Granger noted Wong's leukocytosis had recently resolved, his fatigue seemed to be improving, his hypertension appeared controlled with medication, and Wong continued to work on his hyperlipidemia through dietary therapy. (*Id.*).

Wong reported he was "doing well" on October 20, 2006. (*Id.* at 277). He recounted some fatigue, but noted it was much improved since his last visit. (*Id.*). Wong also reported some chronic right hip and knee pain, as well as diarrhea. (*Id.*). His pain was a four on a ten-point scale. (*Id.*). He was not in any acute distress and demonstrated normal strength and sensation. (*Id.*). His lab results improved over the last year, though he had mild persistent lymphocytosis and monocytosis. (*Id.* at 279).

On November 8, 2006, Wong saw Dr. Sabrina Phillips ("Dr. Phillips") at the Mayo Clinic's Cardiovascular Diseases Department for a cardiac Marfan syndrome consultation. (*Id.* at 346). Dr. Phillips conducted an ophthalmology exam, EKG, echocardiogram, and blood tests, but found no evidence of Marfan syndrome. (*Id.* at 348). She opined, however, he might have another connective tissue disease because of angioid streaks[23] revealed in his retinal exam. (*Id.*).

---

[22]      Somatic means relating to the soma or trunk, the wall of the body cavity, or the body in general. *Stedman's Medical Dictionary*, Somatic, (27th Ed. 2000).
[23]      Angioid streaks are small breaks in the elastic tissue containing the membrane of the retina that can become calcified and crack. *Stedman's Medical Dictionary*, Angioid streaks, (27th Ed. 2000).

Radiograph images of Wong's hips on this date show benign bone islands in the femoral necks bilaterally without degenerative changes or overall contour deformities. (*Id.* at 342). Also, the images revealed spondylolysis in both sides of Wong's lower back. (*Id.*).

Wong also saw physical medicine/rehabilitation specialist Dr. Mark H. Winemiller ("Dr. Winemiller") at the Mayo Clinic regarding his foot pain, back pain, and existing spondylolisthesis diagnosis. (*Id.* at 342). Dr. Winemiller noted Wong's gait was steady and his muscle strength, bulk, tone, and activation were normal and symmetric, with the exception of some weakness in his right hand. (*Id.* at 343). Wong reported numerous daily episodes of a sense of subluxation in several joints, especially the right lateral hip and abdomen. (*Id.* at 342). Wong stated these episodes were moderately painful and left him with "lingering aching pain" for the remainder of the day. (*Id.*). Dr. Winemiller noted Wong appeared to suffer from joint hypermobility syndrome and widespread joint pain associated with presumed recurrent subluxations. (*Id.* at 343). Images of Wong's hip and pelvis taken on February 12, 2007, however, show a normal pelvis and left lateral hip. (*Id.* at 251). He opined that Wong's symptoms were consistent with EDS, despite a lack of history of dislocation of joints recently or structural insufficiency. (*Id.* at 343). Dr. Winemiller provided a physical therapy prescription. (*Id.* at 344).

About one week later, Dr. Granger concluded that "[o]verall [Wong] is doing okay . . . and feeling well." (*Id.* at 275). Wong's blood pressure was slightly elevated, but he reported several recent normal blood pressure checks. (*Id.*). Wong had no cardiac or respiratory complaints. (*Id.*). He complained of ongoing ulnar neuropathy symptoms; all other medical issues appeared to be stable. (*Id.*).

2.        **Medical Records After EDS Diagnosis on December 7, 2006**

On December 7, 2006, Wong met with medical genetics consultant, Dr. Jay Ellison ("Dr. Ellison") at the Mayo Clinic to follow up on a potential connective tissue disorder diagnosis.  (*Id.* at 339).  Based on Wong's history of multiple joints instability, Dr. Ellison diagnosed him with EDS Type III (hypermobility).  (*Id.* at 341).  The "clincher" for him was Wong's reported dislocation of major joints when rolling over in bed.  (*Id.*).  Dr. Ellison provided Wong with "several common-sense measures" to manage his condition and encouraged him to start swimming for exercise.  (*Id.*).

Wong saw Dr. Granger for a follow-up appointment on February 26, 2007.  (*Id.* at 356).  Overall, he reported feeling "fairly well" despite ongoing diffuse joint pain.  (*Id.*).  Wong's blood pressure was elevated.  (*Id.*).  Wong suggested his recent increase in pain caused the increase in blood pressure.  (*Id.*).  Dr. Granger referred Wong to physical therapy and the Minnesota Head and Neck Clinic for additional treatment recommendations.  (*Id.*).

Wong met with Dr. Mary Kwon ("Dr. Kwon") and Dr. Cory Herman ("Dr. Herman") from the Minnesota Head and Neck Clinic sixteen times between March 12, 2007 and September 19, 2007.  (*Id.* at 367–408).  On recommendation from Dr. Kwon and Dr. Herman, Wong began physical therapy, pool therapy, and a self-management program designed to relieve his pain.  (*Id.* at 373–76).  Over the course of his visits at the Minnesota Head and Neck Clinic, Wong complained of pain in different parts of his body that varied from one visit to the next.  (*Id.* at 367–408).  Only his headaches and jaw pain demonstrated lasting improvement.  (*Id.* at 367–408).

Wong began pool therapy on March 29, 2007.  (*Id.* at 414).  He rated his pain as a ten on a ten-point scale and stated it was throughout his body.  (*Id.*).  Between April 6, 2007 and May

17, 2007, he had nine sessions.  (*Id.* at 438, 441, 445, 448, 454, 458, 462, 466, 470).  After each session, the therapist assessed Wong tolerated the treatment "fair" (*Id.* at 419), "fair-well" (*Id.* at 425, 455, 459, 463, 467, 471), or "fair-good" (*Id.* at 421, 423).  Furthermore, except for one week following an especially demanding land physical therapy session, Wong's subjective global pain rating trended down, with one report as low as three or four on a ten-point scale.  (*Id.* at 419, 420, 422, 424, 435, 438, 441, 445, 448, 454, 458, 462, 466, 470).  Wong was discharged to an independent pool therapy program on May 17, 2007.  (*Id.* at 471).

On April 26, 2007, Dr. Granger noted Wong was "doing very well" overall.  (*Id.* at 267).  Although Wong complained of ongoing diffuse joint and muscle pain, he reported his pain had improved and he had no other specific complaints.  (*Id.*).  Dr. Granger also noted good results from Wong's physical and pool therapy.  (*Id.*).

Wong followed up with Dr. Lerner for his leukocytosis on June 30, 2007.  (*Id.* at 263).  The preceding eighteen months of his lab results were stable.  (*Id.*).  Dr. Lerner concluded that Wong's mild leukocytosis could be attributed to his EDS and associated osteoarthritis.  (*Id.*).  Thus, his leukocytosis was likely reactive in nature, rather than reflective of a more serious disorder.  (*Id.*).  She recommended Wong continue to have Dr. Granger check his lab results at least annually.  (*Id.*).

In October 2007, Wong was attending an outside pain clinic, doing pool therapy when possible, and regularly taking tramadol for pain.  (*Id.* at 582).  While Dr. Granger found these things did "a somewhat adequate job of controlling his pain," he believed Wong's "pain [had] become disabling in the sense that he [was] unable to work with this pain."  (*Id.*).  Wong advised Dr. Granger that he was in the process of applying for disability; Dr. Granger concluded he believed disability was "reasonable."  (*Id.*).  In a summary of Wong's medical problems dated

16

October 17, 2007, Dr. Granger summarized his hyperlipidemia as "[c]ontrolled on dietary therapy" and his ulnar neuropathy surgery resulting in improvement of symptoms.  (*Id.* at 545). Dr. Granger also noted chronic somatic secondary pain and degenerative joint disease related to Wong's EDS.  (*Id.*).

Dr. Granger completed a Physical Residual Functional Capacity Questionnaire ("RFC") dated November 8, 2007.  (*Id.* at 532–35).  Dr. Granger listed five impairments: (1) EDS type III; (2) right ulnar neuropathy; (3) chronic leukocytosis; (4) osteoarthritis; (5) hypertension.  (*Id.* at 532).  He opined that Wong was incapable of even "low stress" jobs.  (*Id.* at 533).  He reported Wong would be able to sit for less than thirty minutes at one time or stand for less than ten minutes.  (*Id.*).  In an eight-hour working day, Dr. Granger estimated Wong could sit, stand, or walk for less than two hours.  (*Id.*).  He further noted Wong would need to take unscheduled breaks every one to two hours during the eight-hour workday and each of these would last thirty to sixty minutes.  (*Id.* at 534).  Finally, Dr. Granger stated that Wong's condition could likely produce good days and bad days, and Wong would be absent from work more than four days per month.  (*Id.* at 535).  Dr. Granger suggested emotional factors and stress also contributed to Wong's condition.  (*Id.* at 533).

On April 11, 2008, Wong reported worsened body pain.  (*Id.* at 579).  He attributed the increase in pain to missing some of his pool therapy sessions.  (*Id.*).  On May 7, 2008, hematologist Dr. Douglas Rausch ("Dr. Rausch") noted Wong walked "with a very stiff gait, grimacing with pain."  (*Id.* at 578).  Dr. Rausch suggested that while Wong's leukocytosis might be reactive to his EDS and associated arthritis, it could also be related to his cigarette or marijuana use.  (*Id.*).  Wong reported he had smoked one to two packs of cigarettes a day for over twenty years, but had cut back his use.  (*Id.*).

Dr. Rausch referred Wong to Dr. Salman Waheeduddin ("Dr. Waheeduddin") for a rheumatology evaluation.  (*Id.* at 574–76).  Wong told Dr. Waheeduddin he dislocated joints in the middle of the night and woke up with severe pain all over his body.  (*Id.* at 575).  Wong reported his knees dislocated when he walked and that he used braces for stability.  (*Id.*).  Wong also reported tramadol and marijuana helped control his pain.  (*Id.*).  A May 20, 2008 cardiac ultrasound and June 4, 2008 ultrasound of Wong's abdomen were both normal.  (*Id.* at 548–50).

In September 2008, Wong decided to stop taking his atenolol and took his blood pressure every hour to monitor it.  (*Id.* at 571).  Twenty-four hours after he discontinued his medication, he felt dizzy and recorded an elevated blood pressure.  (*Id.*).  He took an atenolol tablet, however, after he saw spots and had a difficult time walking.  (*Id.* at 570–71).  Wong went to HCMC via ambulance.  (*Id.*).  After a normal EKG and chest x-ray, Wong reported feeling better, but he also noted increasing pain in his left side.  (*Id.* at 571).  On discharge, the emergency room doctor instructed Wong to begin his atenolol again at one-half his normal dose.  (*Id.*).

Wong returned to the emergency room two days later complaining his left side pain had become worse and he felt as though he could not walk without collapsing.  (*Id.* at 570).  He also reported watery diarrhea and weight loss.  (*Id.*).  Although he complained of severe pain, Wong declined pain medications because, as a former addict, he was "very concerned about becoming addicted again."  (*Id.* at 568–70).  Imaging failed to show any evidence of aortic aneurysm or dissection.  (*Id.* at 547).

On October 2, 2008, Wong stated he passed out or nearly passed out the previous weekend, experienced difficulty ambulating, and felt dizzy on standing.  (*Id.* at 565).  Lab work

suggested a potassium deficiency.  (*Id.* at 560).  After increasing his potassium-rich food intake, his symptoms diminished.  (*Id.*).

Wong met with Dr. Kapil Gupta ("Dr. Gupta") of HCMC internal medicine clinic to follow up on his recent hospital visits, abdominal pain, and diarrhea concerns.  (*Id.* at 559–565). Wong stated his diarrhea had been worse in the last month and he had lost about thirty pounds. (*Id.* at 562).  Dr. Gupta performed a capsule endoscopy, which failed to provide any significant findings.  (*Id.* at 547, 559, 561, 564).  Dr. Gupta noted Wong appeared healthy.  (*Id.* at 564). Wong also met with Lisa Molar ("Molar"), a registered dietician, regarding his unintentional weight loss.  (*Id.* at 554).  Wong reported an inability to tolerate many foods, but that nutritional supplements helped him to increase his caloric intake and regain some lost weight.  (*Id.* at 554, 557).  Molar provided information on malabsorptive diets and encouraged protein-rich foods, a daily vitamin, and a fiber product.  (*Id.* at 554–55).

On November 6, 2008, Wong attended a follow-up appointment with Dr. Granger.  (*Id.* at 556–57).  His gastrointestinal complaints persisted.  (*Id.* at 557).  Dr. Granger noted the work up was "fairly unremarkable" and opined it was "possibly related to some autonomic dysfunction related to his [EDS]."  (*Id.* at 557–58).  He concluded the Mayo Clinic was best situated to investigate the potential relationship and made a referral.  (*Id.* at 558).  Wong also reported continued symptoms of increased heart rate and low blood pressure on standing.  (*Id.* at 557). Wong told Dr. Granger that he and his mother looked into EDS and these symptoms, and they found research suggesting an association between EDS and POTS.  (*Id.*).  To confirm the POTS diagnosis, Dr. Granger referred Wong to Mayo's clinic specializing in autonomic dysfunction. (*Id.*).

In November 2008, Dr. Granger found Wong had "very, very significant limitation in his functional status.  He gets fatigued easily.  He has chronic pain, which has a variability from day-to-day, and, thus, at this point in time, he is unable to maintain any significant form of employment."  (*Id.*).  Dr. Granger concluded the combination of Wong's medical problems "significantly limits his ability to hold any sort of gainful employment."  (*Id.* at 558).  Furthermore, Dr. Granger noted Wong's application for disability appeared "appropriate given his significant physical limitations related to his gastrointestinal complaints, his POTS syndrome, and also his chronic pain and joint issues related to Ehlers-Danlos."  (*Id.* at 557–58).

On November 14, 2008, Wong's physical therapist referred him to occupational therapy ("OT") for an evaluation due to a decline in his ability to dress and groom himself.  (*Id.* at 610).  He attended the OT appointment by himself following an aquatic physical therapy ("PT") session and was able to walk without an assistive device.  (*Id.*).  Following the OT appointment, however, Wong required wheelchair assistance.  (*Id.*).

Wong reported he was able to complete most of his self-care activities, but they were time consuming, painful, and fatiguing.  (*Id.* at 610, 652).  Wong fixed cold meals for himself, but felt unsafe using an oven or stove because he was not able to stand for long periods of time and frequently dropped items.  (*Id.* at 610).  Wong never obtained a driver's license and relied on family for transportation.  (*Id.*).  Due to the severity of Wong's chronic pain, upper extremity manual muscle testing was not performed.  (*Id.*).  Wong reported constant pain.  (*Id.* at 611).  He also reported that over the years he learned to separate himself from the pain to appear as though he had no pain.  (*Id.*).  Indeed, the therapist noted, "[h]is facial expressions do not match the severity of his pain.  Therefore, client has difficulty using the standard pain measurement tools to accurately assess pain levels."  (*Id.*).

In November and December 2008, Wong had two land-based PT sessions to address his mobility-related needs and two aquatic PT sessions. (*Id.* at 593). His therapist noted Wong's "medical condition fluctuates greatly. He had some really bad days when he came in for land PT, but did improve some later in the month when he came for pool." (*Id.*). During this time, Wong had home trials with power wheelchairs. (*Id.*). He reported continued pain relief with aquatic PT; however, this relief was temporary. (*Id.*). Wong's high pain levels and intolerance to seated and standing positions prevented land-based exercises during PT. (*Id.*).

In late January 2009, Wong's OT therapist gave him adaptive equipment to use for self-feeding and opening bottles. (*Id.* at 607). About a week later, Wong returned to see Dr. Granger for a three-month follow-up visit. (*Id.* at 551–52). Dr. Granger noted Wong's chronic medical conditions appeared to have worsened recently. (*Id.* at 552). Wong appeared fatigued, in some degree of pain, and stayed lying down on the examination table throughout the interaction. (*Id.*). Dr. Granger encouraged Wong to consider a bulking agent, such as fiber, to help with his loose stools and diarrhea. (*Id.*). Dr. Granger concluded Wong likely had a "[POTS-] type syndrome." (*Id.*). Dr. Granger reduced Wong's atenolol prescription from 50 mg to 25 mg and put him on tramadol for pain. (*Id.*).

In February 2009, Wong returned to aquatic PT after a month-long absence. (*Id.* at 590). As a result of his absence, Wong had to "re-establish" a baseline tolerance for his exercises. (*Id.*). He needed frequent rest periods when walking. (*Id.*).

Wong saw Dr. Gupta for a follow up on his chronic diarrhea and abdominal pain in early March 2009. (*Id.* at 551). Wong reported feeling much better, with more formed bowel movements and some weight gain. (*Id.*). Dr. Gupta noted Wong was "quite stable" on dietary modification. (*Id.*). She also noted all his tests were negative and concluded his EDS

exacerbated his "IBS[-]like symptoms." (*Id.*). She instructed Wong to follow up with primary care. (*Id.*).

Later in the month, Wong had another normal ultrasound of his abdomen. (*Id.* at 546). He also had two OT sessions. (*Id.* at 604, 644). The primary goals of his OT sessions were energy conservation, fatigue management, and work simplification. (*Id.*). His OT therapist provided foam tubing for assistance in gripping a toothbrush and writing utensils. (*Id.* at 604).

In June, Wong followed up with Dr. Granger. (*Id.* at 614–15). Wong reported continued dizziness and fatigue with minimal exertion, often lying supine for an extended period to "feel okay." (*Id.*). Despite Dr. Gupta's conclusions in March, Dr. Granger noted Wong continued to suffer from chronic diarrhea. (*Id.* at 615). Dr. Granger made a referral to the GI clinic at HCMC.[24] (*Id.*). At this time, Dr. Granger concluded Wong did not have the ability to hold any gainful employment. (*Id.*). Specifically, he found:

> The combination of dizziness requiring extended periods of supine position during the day along with chronic joint pain and fatigue and chronic diarrhea with up to ten to twelve bowel movements per day would make any work setting not possible for Mr. Wong to maintain. Therefore, at this time, this patient does not have the ability to hold any employment and I do not predict that he will have any future ability to hold employment.

(*Id.*). In addition to this opinion, Dr. Granger submitted a completed "Request for Adult Medical Examination" form (DHS 161A-Hennepin County 118 [F-K 12.0]) which indicated Wong had an illness or injury that prevented him from performing the normal activities of daily living and the condition would last twelve months or longer. (*Id.* at 616). Dr. Granger could not approximate the date on which Wong would be able to perform the normal activities of daily living. (*Id.*).

---

[24]     Wong requested this referral, preferably with a different practitioner. (*Id.* at 615). Dr. Granger made the referral. (*Id.* at 615).

Similarly, on June 9, 2009, Dr. Granger signed Wong's "Loan Discharge Application: Total and Permanent Disability" certifying Wong's medication conditions prevented him "from being able to work and earn money in any capacity." (*Id.* at 617). Dr. Granger noted Wong became unable to work and earn money in any capacity beginning on March 1, 2006.[25] (*Id.*).

### 3.    Medical Records Submitted After the Administrative Hearing

After the hearing, Wong submitted records from the Mayo Clinic from 2008 to 2009 (*Id.* at 674–701) and records from the Courage Center from March 2009. (*Id.* at 633–73). According to those records, Wong attended aquatic PT and OT at the Courage Center from August 2008 to August 2009. (*Id.* at 639–72). By the end of October 2008, Wong cancelled all but three aquatic PT appointments due to high blood pressure, reportedly from the pain he was experiencing. (*Id.* at 661).

On November 20, 2008, autonomic consultant Dr. Phillip Low ("Dr. Low") conducted a tilt table test[26] and found no evidence of autonomic failure, despite Wong's complaints of seeing spots, breathing fast, tingling scalp, and shakiness. (*Id.* at 692). Dr. Low concluded Wong's symptoms suggested only hyperventilation and anxiety. (*Id.*). Dr. Low also noted "[o]rthostatic hypotension was not detected." (*Id.*). Dr. Robert D. Fealey ("Dr. Fealey") reviewed the test results and, while he agreed there did not appear to be any underlying nerve damage, he concluded Wong had orthostatic intolerance. (*Id.* at 678, 682). Based on Wong's past reports of increased heart rate upon standing, Dr. Fealey suggested Wong was still partially beta blocked by

---

[25]    This date is approximately five months after Wong's alleged onset date. (*See id.* at 119, 125, 145).

[26]    A tilt table test is used to evaluate the cause of unexplained fainting. <u>Tilt Table Test</u>, Mayo Clinic (Feb. 3, 2010), http://www.mayoclinic.com/health/tilt-table-test/MY01091. During a tilt table test, a patient lies on a table that moves from a horizontal to a vertical position. *Id.* The patient's heart rate and blood pressure are monitored throughout the tilt table test. *Id.*

his atenolol at the time of the test, producing inaccurate results.[27]   (*Id.* at 682).   Dr. Fealey noted Wong had "plenty of symptoms" when tilted upright and agreed with Dr. Low that these symptoms were due, at least in part, to hyperventilation.   (*Id.*).   Dr. Fealey stressed the importance of learning to control hyperventilation and provided some suggestions.   (*Id.*). Specifically, Dr. Fealey encouraged Wong to be as active as possible on his feet "as deconditioning undoubtedly is a part of his orthostatic intolerance."   (*Id.* at 684).   Dr. Fealey noted Wong was "a highly complex case."   (*Id.* at 680).

On January 19, 2009, Wong complained of ongoing muscle and joint pains.   (*Id.* at 676). Dr. Fealey performed a neurological exam and found minimal signs of right ulnar neuropathy and some subjective decrease in sensation below the knees.   (*Id.* at 678).   Dr. Fealey commented on Wong's EDS and noted there was no objective evidence of joint disease.   (*Id.* at 680).   He ordered an EMG of Wong's upper and lower extremities to search for evidence of muscle disease that might explain the pain.   (*Id.*).   Wong's EMG was normal and ruled out widespread nerve damage.   (*Id.* at 682, 694).   The EMG displayed evidence of Wong's right ulnar nerve conductions and allowed Dr. Fealey to compare them to Wong's pre-operation status.   (*Id.* at 682).   He noted they were "markedly improved."   (*Id.*).   Further, these results demonstrated that Wong's motor strength was returning to his right hand.   (*Id.*).

---

[27]   At the time of the tilt table test, Wong was on atenolol.   (*Id.* at 557–58).   He had only been off the drug for 48 hours at the time of the test.   (*Id.* at 678).   Atenolol is a beta blocker and the initial treatment for POTS.   (*Id.* at 557–58); *Stedman's Medical Dictionary*, Atenolol, (27th Ed. 2000).   As a beta blocker, atenolol causes the heart to beat more slowly and with less force, thereby reducing blood pressure.   Beta blockers, Mayo Clinic (Dec. 16, 2010), http://www.mayoclinic.com/health/beta-blockers/HI00059.

Wong also reported that he recently discovered his pain medication had been stolen and replaced with Tylenol and/or Excedrin aspirin. (*Id.* at 676). This went on for a period of about six to eight months before someone caught the problem.[28] (*Id.*).

In March 2009, Wong's PT focused on self-care activities and use of adaptive equipment. (*Id.* at 642). Notes from June 23, 2009 state Wong progressed in gaining upper and lower extremity strength and his ability to tolerate more pool activities. (*Id.* at 640). The notes further state that while Wong has pain at all times, it varies according to the day and activity level. (*Id.*). Wong reported he was unable to tolerate his pain medication due to the side effects on his stomach and, therefore, he was in more pain. (*Id.*). While aquatic therapy provided great pain relief during the session, Wong found it very painful in his lower extremity joints to exit the pool. (*Id.*). He was discharged from PT on July 7, 2009.[29] (*Id.* at 639).

On February 1, 2010, Wong saw Dr. Dara Koozekanani ("Dr. Koozekanani") at the University of Minnesota's Department of Ophthalmology for his EDS and angioid streaks. (*Id.* at 624). Wong complained of increasing nearsightedness. (*Id.* at 622). Dr. Koozekanani noted Wong's systemic hypertension and POTS caused his vision to fade or black out when he stood up quickly. (*Id.*). Wong reported intermittent episodes of blurred vision lasting up to a few hours. (*Id.*).

---

[28]   The record does not contain more specific information about the timing of stolen tramadol, when the theft was discovered, or how the swapped medication may have affected his symptoms. Wong reported some relief with the Excedrin. (*Id.* at 676). Wong's liver functioning tests showed no ill effects or marked hepatotoxicity from ingesting such high doses of acetaminophen. (*Id.* at 552, 684).
[29]   No discharge date for OT is noted in the record. The last record is from August 20, 2009, and notes OT is "On hold, Coordinating a care conference." (*Id.* at 639).

Dr. Koozekanani reported a moderate number of angioid streaks around the nerve of both eyes. (*Id.* at 624). Dr. Koozekanani advised Wong that EDS put him at increased risk of retinal detachment and explained the signs and symptoms. (*Id.*).

On April 11, 2010, Wong's primary care physician at the time, Dr. Jennifer Welsh ("Dr. Welsh"), asked Dr. James Agre ("Dr. Agre") to evaluate Wong for his whole-body pain and weakness. (*Id.* at 621). Wong reported chronic body pain in his skin, joints, and muscles; headaches; "body pains with difficulty sleeping"; dizziness related to orthostatic hypotension; occasional shortness of breath; abdominal pain; and intolerance to heat and cold. (*Id.*). Wong also reported "frequent subluxation and dislocation in his shoulders, elbows, hips, [and] knees." (*Id.*). Wong told Dr. Agre he had difficulty walking and could only go two blocks at the most. (*Id.*).

Wong told Dr. Agre his two years of aquatic PT helped his strength greatly. (*Id.*). At the time of the appointment, Wong was continuing the aquatic PT exercises by himself. (*Id.*). Based on his experience, Wong was opposed to starting any new medications and using a knee brace. (*Id.*).

During a physical examination, Dr. Agre noted Wong's severe hyperextensibility. (*Id.*). Also, he noted Wong's difficulty in raising his arms above his head and a short, shuffling gait. (*Id.*). Wong was only able to ambulate several feet before becoming fatigued and complaining of body aches. (*Id.*).

Dr. Agre recommended Wong participate in PT again for strengthening and improvement of his range of motion. (*Id.* at 622). He also recommended that Wong's PT provide treatments for his generalized muscle pain. (*Id.*). Finally, Dr. Agre also mentioned the potential

recommendation of "an electric device with electric mobility due to [Wong's] limited strength and fatigue with any long distance ambulation." (*Id.*).

Wong applied for insurance coverage to obtain a motorized wheelchair. (*See id.* at 619). Dr. Agre was asked to provide a comprehensive functional capacity evaluation for that application. (*Id.*). On August 12, 2010, Dr. Agre wrote a letter stating he did not think an evaluation would provide "meaningful information" for Wong and would "expose him to severe stress." (*Id.*). Dr. Agre noted that Wong "has severe dysfunction" and requiring such an evaluation would "probably flare his pain up weeks if not months thereafter." (*Id.*).

Dr. Agre went on to opine "to a reasonable degree of medical probability that Mr. Eric Wong is unemployable." (*Id.*). Further, he cited Wong's "frequent subluxations of the shoulders, elbows, hips, and knees" and Wong's "severe pain disorder." (*Id.*). According to Dr. Agre's records, on June 3, 2010, Wong could walk two city blocks in 45 to 60 minutes, but needed to rest four times. (*Id.*). "This is not very functional," he noted. (*Id.*). Further, Dr. Agre concluded Wong would "not be employable even seat[ed] taking periodic rest breaks." (*Id.*). In sum, Dr. Agre found that "[t]o perform a functional capacity evaluation would not provide any useful information. It would simply show he can do no activity that would allow him to be gainfully employed. It would, of course, lead the patient to experience a significant flare-up of his pain for indterminant [sic] length of time." (*Id.*).

Wong submitted a letter to the Appeals Council accompanying these records. (*Id.* at 626). In his letter, he discussed two major points: "(1) Assertions in the ruling that Mr. Wong has worked since 2005 and; (2) Statements made by Dr. Steiner, the medical expert at the hearing." (*Id.* at 626).

27

There is some dispute between the medical records and Wong's testimony at the hearing regarding whether he returned to work after his alleged onset date.  For example, some medical records after his alleged onset date suggest Wong told his doctors he still worked at a self-employed computer business.  (*See id.* at 297).  The ALJ noted these inconsistencies in his opinion.  (*Id.* at 18).  Wong asserted that these records were incorrect, that he never told any doctors he returned to work, and that, in fact, he did not return to work.  (*Id.* at 62).  He cited several items to support this position including financial documents from his business demonstrating progressively lower incomes in the years before 2005; his "disabled" status with Hennepin County, the State of Minnesota, and the Federal Student Loan Administration since 2005; and a statement from Wong's mother to the Appeals Council stating he has not been able to work or earn money since 2005.[30]  (*Id.* at 626, 628).

Wong also noted "[m]uch of the research on [EDS] has been done this decade."  (*Id.* at 628).  He suggested that Dr. Steiner had only "outdated" information about EDS.  (*Id.*).  Wong argued Dr. Steiner's statements and opinions "call into question his claim to have expertise in EDS and his ability to accurately assess Mr. Wong's condition in light of current knowledge and without examining Wong."  (*Id.*).  Specifically, Wong took issue with Dr. Steiner's statements on the following: the rarity of EDS, the use of clinical testing to reveal evidence of EDS, the severity of Wong's EDS and POTS symptoms, and the relationship between Wong's EDS and his other conditions.  (*Id.* at 628–31).  Wong provided information to rebut Dr. Steiner on those points.  (*Id.*).  That information included statistics from the National Institute of Health on EDS, references to his testimony and medical records, and excerpts from an interview with a physician

---

[30]     The record does not include any statement from Wong's mother to the Appeals Council.

28

whose research area focuses on EDS.[31]   (*Id.* at 630–31).   He asserted the excerpt suggested Dr. Steiner's knowledge of EDS and his evaluation of the medical record were inaccurate.   (*Id.* at 630).

### 4.       State Agency Medical Consultants' Opinions

Dr. Aaron Mark ("Dr. Mark") reviewed Wong's medical records and assessed his impairments and functioning on November 14, 2006.   (*Id.* at 317).   Dr. Mark completed a Physical RFC Assessment based on his findings and concluded Wong was capable of medium work.   (*Id.* at 15, 317–24).   The primary diagnosis identified was nerve compression in his right elbow and the secondary diagnosis was hypertension.   (*Id.* at 317).   "Possible Marfans" and fatigue were listed as other alleged impairments.   (*Id.*).   Dr. Mark noted that despite the consistent complaints of chest pain, there was no evidence of cardiac irregularity in the record: a stress echo test was normal; chest x-rays were unremarkable; and while an ECG showed some mild mitral insufficiency, a CT angiogram of his thoracic aorta was negative.   (*Id.* at 319).   Further, Dr. Mark noted that Wong's hypertension was well managed with medications and his blood pressure was within a reasonable range.   (*Id.*).   Dr. Mark also noted Wong's upper and lower extremity muscle mass and strength were normal.   (*Id.*).   Dr. Mark concluded Wong's chronic fatigue, back and pelvic pain, and ulnar nerve neuropathy did not create appreciable limitations for Wong under the terms of a medium RFC.   (*Id.* at 317–24).

On July 16, 2007, Dr. Howard Atkin ("Dr. Atkin") reviewed Wong's file and Dr. Mark's assessment on reconsideration.   (*Id.* at 475).   Dr. Atkin identified the following problems: (1) hypertension, (2) hyperlipidemia, (3) nerve damage to the right arm, (4) EDS, and (5) history of

---

[31]       A transcript of the entire interview was provided to the Appeals Council before Wong's letter.   (*Id.* at 630).

polysubstance abuse.[32]  (*Id.* at 476).  Dr. Atkin affirmed Dr. Mark's assessment as it was written.  (*Id.* at 475).  In doing so, Dr. Atkin explicitly agreed with the medium RFC Dr. Mark assigned to Wong.  (*Id.* at 476).

### D.        Medical Expert Testimony

Dr. Andrew Murphy Steiner testified as a medical expert ("ME") at the hearing.  (*Id.* at 41–48, 113).  He holds a medical degree from Creighton University and has been a licensed physician since 1963.  (*Id.* at 115).  Dr. Steiner is board certified in Physical Medicine and Rehabilitation.  (*Id.*).

Dr. Steiner summarized the record and found it contained reports and treatment for generalized pain, diffuse joint and muscle pain, myofascial[33] pain, and fatigue, eventually attributed to EDS.  (*Id.* at 41).  He testified that there are degrees of EDS, which could yield "significant evidence of joint dislocation and instabilities."  (*Id.* at 44).  Dr. Steiner explained the hyperelasticity of tissues around the joints causes joint dislocations and that if there are significant subluxations or dislocations of joints, it can be very painful.  (*Id.* at 44–45).  He concluded evidence of joint dislocation and instability was not present in this case.  (*Id.* at 44).  He found that while there were reports of frequent joint dislocation, there were not clinical observations to support them.  (*Id.* at 41).  Similarly, while doctors noted hyperextensibility of

---

[32]      Marfan syndrome was ruled out between the initial filing and reconsideration.  (*Id.* at 481).  Also, EDS was diagnosed and added to Wong's application between the initial denial and the reconsideration.  (*Id.*).

[33]      Myofascial pain is pain in the fascia surrounding and separating muscle tissue.  *See Stedman's Medical Dictionary*, Myofascial, (27th Ed. 2000).  Fascia is a sheet of fibrous tissue that envelops the body beneath the skin that encloses muscles and groups of muscles, and separates their several layers or groups.  *Stedman's Medical Dictionary*, Fascia, (27th Ed. 2000).

joints, Dr. Steiner testified Wong's joints were structurally stable and emphasized that physicians had not seen dislocations clinically.[34]  (*Id.*).

Dr. Steiner further noted, "there seem[ed] to be an awful lot of pain here, considering the minimal findings."  (*Id.* at 45).  Specifically, Dr. Steiner opined that while EDS can cause chronic joint pain and fatigue, sufficient findings were not present in this case.  (*Id.*).

Wong's lifelong, chronic diarrhea was of an unclear etiology, despite extensive work up. (*Id.* at 41).  Dr. Steiner asserted that chronic diarrhea is not typically associated with EDS and noted that while one examiner suggested autonomic dysfunction caused the diarrhea, no records proved it.  (*Id.* at 41, 45).

Also, Dr. Steiner opined there is generally not a connection between EDS and cardiac conditions.  (*Id.* at 47).  He acknowledged reports of lightheadedness or presyncopal episodes, which examiners supposed could be due to an autonomic insufficiency.  (*Id.* at 42).  He advised that while there were orders from those examiners for a tilt-table test, he did not see a record of such a test.[35]  (*Id.*).  In addition, Dr. Steiner stated the reports are unclear on the severity of those light-headed instances.  (*Id.*).  Dr. Steiner also noted there is no evidence of ongoing low blood pressure or tachycardia readings.  (*Id.*).  Rather, Wong's "blood pressure's been elevated or tended to be on the high side . . . and the pulses have been low."  (*Id.*).

Similarly, Dr. Steiner explained there was insufficient clinical evidence to conclude POTS was present in this case.  (*Id.* at 46).  He described POTS as "not an uncommon condition associated with any condition that has autonomic deficits."  (*Id.*).  Specifically, Dr. Steiner stated

---

[34]     The only report of a dislocation in the record is from a PT assistant, who the ME suggests is not "a reliable source."  (*Id.* at 41).

[35]     Wong had a tilt table test in 2008.  (*Id.* at 690, 692).  It is not clear from the record or the parties' briefs, but it appears the results of the test may not have been a part of Wong's file at the time of Dr. Steiner's review.  (*Id.* at 674, 690, 692).

the record does not reflect the symptoms one would expect to see, including a drop in blood pressure with changes in position and more frequent reports of lightheadedness.   (*Id.*). Importantly, he noted Wong's blood pressure was generally above normal and there was no evidence of ongoing tachycardia.   (*Id.*).   While he acknowledged the need to lie down might be something POTS could result in, it would only be in severe cases.   (*Id.* at 46–47).   Even then, he said it would be "unusual."   (*Id.* at 46).   Further, he cited medications or other measures used in those cases and noted none of those things existed in Wong's file.   (*Id.* at 47).   Dr. Steiner concluded the record lacks "good evidence of any kind of POTS disease of any severity."   (*Id.*).

He found reports of low back pain could be "possibly related to spondylosis," but also noted the records "don't have details on this."   (*Id.* at 42).   He suggested Wong's headaches "may be related to caffeine."   (*Id.*).   Dr. Steiner summarized Wong's ulnar nerve transposition surgery[36] and the "good functional result" with "no ongoing loss of hand use."   (*Id.*).   Dr. Steiner recognized Wong's reported hip pain and noted only x-rays of his hips were normal.   (*Id.*). Finally, Dr. Steiner noted Wong's history of chemical dependency, ethanol abuse, tobacco use, and chronic marijuana use.   (*Id.* at 42–43).

Dr. Steiner concluded this was "primarily a pain situation," and he did not see any medical condition that would limit Wong's exertion level to something less than sedentary.   (*Id.* at 43).   He believed the record supported a residual of "at least sedentary."   (*Id.*).   In sum, he disagreed with Dr. Granger's physical RFC form and found it "extremely restrictive in many ways."   (*Id.*).

---

[36]   His testimony suggests bilateral surgery for this problem, but the records reflect surgery only on the right arm.   (*Id.* at 283).

###### E.        Evidence from the Vocational Expert

Robert A. Brezinski ("Brezinski") testified as a vocational expert ("VE") at the hearing before the ALJ.  (*Id.* at 48–52).  Brezinski has a M.S. in Vocational Rehabilitation Counseling from Minnesota State University–Mankato.  (*Id.* at 117).  He is a certified rehabilitation counselor.  (*Id.*).

The ALJ asked Brezinski to consider a hypothetical younger person with the same work experience as Wong and who is limited to sedentary-type work activities, requiring a sit-down job.  (*Id.* at 48).  Brezinski testified that a person with those restrictions would be capable of performing a systems analyst position.  (*Id.*).  Further, Brezinski concluded such an individual could be an order clerk (DOT 249.362-026).  (*Id.* at 49).  An order clerk is a sedentary, semi-skilled occupation.  (*Id.*).  Brezinski noted there were about 4500 open positions of that nature in Minnesota.  (*Id.*).

Brezinski opined that if an employee is absent more than two days per month in positions like an order clerk, they are unable to maintain competitive work.  (*Id.* at 49).  Brezinski testified that an employee who exceeds the normal break schedule might be interrupting the workflow and putting the employment situation in jeopardy.  (*Id.* at 50).  He asserted the normal break schedule would be fifteen minutes in the morning and afternoon, with a lunch break of thirty to sixty minutes, and use of the restroom or get a drink at reasonable times.  (*Id.* at 49–50).

Wong's attorney then asked Brezinski about a situation where an employee takes ten to twelve restroom breaks in an eight-hour shift.  (*Id.* at 50).  Brezinski responded that in most cases, an employer would not tolerate such frequency.  (*Id.*).  He suggested that up to once an hour would be reasonable for employee to get up and go to the restroom for a brief period or get

a drink.  (*Id.*).  Similarly, Brzezinski testified an employer would not tolerate an employee

needing to lie down several times during the course of the workday.  (*Id.* at 51).

Wong's attorney then questioned Brezinski about the particulars of the order clerk

position.  (*Id.*).  Brezinski explained that the occupation involved "frequent to continuous" use of

hands and fingers to type in and access information on a computer.  (*Id.*).

###    F.    The ALJ's Decision

On October 13, 2009, ALJ Washington issued an unfavorable decision.  (*Id.* at 8–20).  In

finding that Wong was not disabled, the ALJ employed the required five-step evaluation

considering: (1) whether Wong was engaged in substantial gainful activity; (2) whether Wong

had severe impairments; (3) whether Wong's impairments met or equaled impairments listed in

20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Wong was capable of returning to past

work; and (5) whether Wong could do other work existing in significant numbers in the regional

or national economy.  *See* 20 C.F.R. § 416.920(a)–(f).

At the first step of the evaluation, the ALJ found Wong had not engaged in substantial

gainful activity since September 30, 2005.  (*Id.* at 13).  At the second step, the ALJ found Wong

had the following severe impairments: (1) EDS with chronic fatigue; (2) POTS[37] with chronic

fatigue; (3) scoliosis[38]; (4) spondylolisthesis with no neurological deficits; (5) hypertension

controlled with medication; (6) hyperlipidemia controlled with medication; (7) lifelong chronic

---

[37]    Dr. Granger and the ALJ refer to "Pott's syndrome" or "Pott's disease" in their records.
(*Id.* at 8–20; *Id.* at 552, 612).  Pott's syndrome and Pott's disease are separate, distinct
conditions.  They are not to be confused with POTS syndrome.  It is assumed these references
are inadvertent misspellings of POTS syndrome, which Wong was diagnosed with in 2009.  (*Id.*
at 684).
[38]    Medical records authored by Dr. Phillips at the Mayo Clinic from November 8, 2006
indicate Dr. Phillips observed "[n]o evidence of scoliosis" in Wong's chest x-rays.  (*Id.* at 348).

diarrhea of unclear etiology; (8) chronic leukocytosis of unclear etiology; (9) a history of bilateral ulnar surgery.  (*Id.*)  (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).

At step three, consistent with the opinions of the State Agency Medical Consultants and the testimony of the ME, the ALJ determined Wong did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525–1526, 416.920(d), 416.925–926).  (*Id.* at 13–14).

At step four of the evaluation, the ALJ was required to consider Wong's subjective complaints as well as objective medical evidence.  (*Id.* at 14–15).  First, the ALJ found that although there was some degree of pain or limitation stemming from Wong's medically established impairments, the medical record did not support the alleged degree of pain or limitation.  (*Id.* at 17).  Also, the ALJ found the asserted persistence and severity of Wong's subjective complaints of chronic, severe, and unwavering pain were unsubstantiated by objective medical findings, and therefore, not credible.  (*Id.*).  Affording some weight to Wong's subjective complaints, the ALJ concluded the limiting effects of his symptoms were not credible to the extent they were inconsistent with a sedentary RFC.  (*Id.* at 15).

The ALJ concluded (1) the objective medical evidence and treatment record was inconsistent with either impairments of such severity or symptoms of any intensity, frequency, or duration which would require greater RFC reductions; (2) the medical records were inconsistent with a conclusion of disability; and (3) Wong's conservative treatment, independent self-care, daily activity, and other factors did not support the need for further RFC considerations.  (*Id.*).

The ALJ gave the greatest weight to the testimony of Dr. Steiner and RFCs from the State Agency Medical Consultants.  (*Id.* at 15, 17).  The ALJ declined to give controlling weight

to Dr. Granger, Wong's treating physician, and his opinion that Wong would require a less than sedentary exertional level and breaks every one or two hours. (*Id.* at 17). The ALJ rejected Dr. Granger's conclusions, finding his assertions were based solely on Wong's subjective complaints of pain, complaints the ALJ did not find credible. (*Id.*). Significantly, the ALJ found the objective medical evidence did not support Dr. Granger's RFC. (*Id.*).

Specifically, the ALJ found Wong's hypertension and high cholesterol well managed with medications. (*Id.* at 15). In addition, he found Wong's blood pressure readings were in the reasonable range. (*Id.*). Wong had a normal stress echo, chest x-ray, and CT angiogram; an echocardiogram showed only some mild mitral trace insufficiency. (*Id.*). Despite reports of chronic fatigue, extensive work up ruled out cardiac and respiratory dysfunction. (*Id.*). Records show Wong told his doctor his fatigue was improved. (*Id.*). Wong had a normal gait and walked unassisted, notwithstanding his complaints of intermittent low back and pelvic pain complaints. (*Id.*). The ALJ also noted Wong's extremities were grossly normal in strength and sensation except for numbness in his fifth and fourth digits on his right hand. (*Id.*). Finally, Wong recovered without complication from a nerve transposition procedure. (*Id.*).

The ALJ conceded that while there is some degree of pain or limitation stemming from Wong's impairments, the overall medical record did not support the degree of pain or limitation alleged. In particular, the ALJ stated there were multiple medical records from multiple sources where the claimant was described as in no pain, no acute distress, or comfortable upon examination. (*Id.* at 17). The ALJ cited x-rays of Wong's hips, which "were normal with no evidence of structural abnormality or fracture." (*Id.* at 16). Also, the ALJ found there were multiple physical examinations showing no shoulder, wrist, or knee edema; normal strength; normal reflexes and sensation; normal range of motion; normal gait; and no reduced range of

motion due to claimant's subjective reports of pain.  (*Id.* at 17).  The ALJ concluded the objective medical evidence failed to confirm the severity of the alleged pain.  (*Id.*).  Giving some weight, however, to Wong's subjective complaints, the ME's testimony, and "more recently received objective medical evidence supporting greater work limitations," the ALJ reduced the RFC to sedentary exertional level.  (*Id.*).

The ALJ found Wong's medical condition stable and his treatment conservative with medication management and therapy.  (*Id.* at 18).  The ALJ noted Wong's last appointment with Dr. Granger and the subsequent decision to continue with treatment with medication.  (*Id.*).  Furthermore, the ALJ found Wong's daily activities within the range of a sedentary RFC.  (*Id.*).  He cited Wong's independence in self-care and his management of his medication and doctor's appointments.  (*Id.*).  He also cited Wong's ability to do light household chores, prepare meals, take walks, and walk without an assistive device.[39]  (*Id.*).  In addition, the ALJ noted Wong's history of polysubstance abuse and chronic marijuana use.  (*Id.* at 17).

The ALJ questioned Wong's credibility based on inconsistencies in medical records that suggested Wong was still employed after the alleged onset date.  (*Id.* at 18).  Finding these records incompatible with Wong's testimony that he had not worked since September 30, 2005, the ALJ also noted that Wong had not reported earnings since 2002 and suggested it was "possible that he worked for cash and failed to report his earnings to the Internal Revenue Service."  (*Id.*).  With that, the ALJ was not persuaded Wong was "unable to work fulltime or at sustained gainful levels due to the fact that he has shown an ability to work since the date of

---

[39]     The record contains some references to Wong's occasional need for a wheelchair, a cane, or use of braces for stability and his home tests of wheelchairs.  (*Id.* at 399, 575, 593, 610, 621).  Evidence of Wong's application for a motorized wheelchair, however, was not submitted until after the ALJ's decision was released.  (*Id.* at 619–19).

onset, and his daily activities are inconsistent with total disability and the objective medical evidence does not support a finding of disability." (*Id.*).

At step five, the ALJ determined Wong was capable of performing past work as a systems analyst, which did not require the performance of work-related activities that Wong's sedentary RFC precluded. (*Id.* at 19). Alternatively, the ALJ concluded there were other jobs existing in the national economy that Wong was also able to perform. (*Id.*). The ALJ based his determination on the testimony of the VE and agreed that Wong was capable of performing the full range of sedentary work. (*Id.* at 19–20). Accordingly, the ALJ concluded that Wong was not disabled from September 30, 2005 (alleged onset of Wong's disability) to October 13, 2009 (date of the ALJ's written decision) as defined in 20 C.F.R. § 404.1520(f) and 416.920(f). (*Id.* at 20).

## II.   STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(2)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." *Id.*

A.          **Administrative Review**

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929, 416.1429.  If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic.  20 C.F.R. §§ 404.967–.982, 416.1467.  If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court.  An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

B.          **Judicial Review**

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive.  42 U.S.C. § 405(g).  This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'" *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002)).  A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as

evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors: (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d

1211, 1217 (8th Cir. 2001).  This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently."  *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

The ALJ did not address whether Wong met or equaled Listing § 1.02A.  For that reason, the Court recommends that the case be remanded.[40]

> Listing § 1.02A falls under Section 1.00 (Musculoskeletal System) and requires:
>
> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

 20 C.F.R. pt. 404, subpt. P, App. 1, § 1.02A.  Wong had the burden to prove he met a listing, and the Commissioner argues he failed to present evidence of "any specific listing-level findings or explain how the record shows he met or equaled the Listings criteria."  (Def.'s Mem. in Supp. of Mot. for Summ. J.) [Doc. No. 16, at 11].  Also, the Commissioner argues Wong failed to present evidence on his inability to ambulate effectively, one of the requirements under Listing § 1.02A.  The ALJ failed to address Listing § 1.02A—or any other specific listing, for that matter—in his decision.  This Court, therefore, cannot conclude that substantial evidence

---

[40]     The Court does not address the arguments raised regarding steps four and five.  The five-step analysis the ALJ is required to perform is sequential.  Because the ALJ failed to meet his obligation at step three, the record is insufficiently developed to allow the Court to evaluate whether substantial evidence supports the ALJ's decision as to steps four and five.

supports the Commissioner's decision.  Thus, the ALJ's findings are insufficient for meaningful review, and remand is appropriate.

In his applications and at the administrative hearing, Wong provided ample evidence of symptoms related to his musculoskeletal system due to EDS.  It is undisputed that Wong's doctors diagnosed him with EDS in 2006 and he continued to suffer from EDS symptoms at the time of the hearing.  (*See, e.g.*, Admin. R. at 263, 265–67, 269–71, 341, 355–57, 357–58, 367–68, 373–74, 375–76, 377–78, 433, 545, 577–78, 582, 621–22, 624).  Wong testified that EDS was the primary reason he was unable to work.  (*Id.* at 25).  He explained his EDS-related symptoms and the limitations they imposed on his abilities.  Specifically, he identified fatigue, joint dislocation, and joint pain as the major medical problems associated with his EDS.  (*Id.* at 25, 27–29, 33–34).

Wong's medical records provided evidence he met the requirements of Listing § 1.02A.  The Listing requires five primary elements: (1) a showing of anatomical deformity, characterized by symptoms including subluxation and instability; (2) chronic joint pain and stiffness with limitation of motion or other abnormal motion of those joints; (3) imaging revealing joint space narrowing, body destruction, or ankylosis of the affected joints; (4) involvement of at least one major weight-bearing joint, including hips, knees, or ankles; and (5) an inability to ambulate effectively.  Wong's medical reports are replete with references to subluxation and instability.[41] Also, Wong's treating doctors noted nearly continuous complaints of joint pain and stiffness,[42] as

---

[41]     *Id.* at 341–43, 361–62, 367–68, 373–74, 375–76, 377–78, 433, 573–75, 599–601, 610–12, 619, 621–22, 652–54, 665–69, 676–80.
[42]     *Id.* at 269–71, 283–89, 289–91, 355–57, 361–62, 367–68, 373–74, 375–76, 377–78, 387–88, 403–04, 433, 516–18, 519–20, 556, 577–78, 579, 582, 599–601, 614–15, 621–22, 665–69

well as several complaints of fatigue.[43]  Wong's records provide substantial medical evidence of involvement of a number of weight-bearing joints, including hip,[44] knee,[45] ankle,[46] shoulder,[47] elbow,[48] and wrist.[49]  Thus, ample evidence suggests Wong could satisfy Listing § 1.02A.

Nevertheless, despite the obvious relationship between Wong's condition and Listing § 1.02A, the ALJ never provided an explanation or analysis as to why the many references in the record failed to support a finding that this severe impairment met or equaled that Listing.  In fact, the ALJ never cited Listing § 1.02A or provided evidence that he considered any listing relevant to Wong's claim.  Instead, the ALJ nakedly asserted that Wong "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1."  (*Id.* at 13).  The ALJ's superficial "analysis" of this issue states only that his assessment is "[c]onsistent with the opinions of the State Agency Medical Consultants and the testimony of the medical expert."  (*Id.* at 14).  A conclusory assertion relying upon the testimony of non-treating physicians falls short of the ALJ's obligation to develop the record and adequately explain his decision.  With no indication that the

---

[43]     *Id.* at 263–65, 277–79, 283–89, 289-91, 293, 299–303, 307–09, 311–12, 312–15, 315–16, 346–50, 492, 494, 500, 502, 504, 506–07, 509–11, 516–18, 515, 519–20, 527–28, 551–53, 556, 582, 590–92, 610–12, 614–15, 621–22, 652–54, 655–57.

[44]     *Id.* at 251–52, 263–65, 271, 277–79, 333–38, 342–44, 346–50, 357–58, 361–62, 367–68, 369–70, 371–72, 373–74, 377–78, 379–80, 381–82, 383–84, 387–88, 389–90, 391–92, 393–94, 395–96, 397–98, 424, 433, 448–50, 433, 527–28, 573–75, 619, 621–22, 696–700.

[45]     *Id.* at 247–50, 257–59, 263–65, 277–79, 342–44, 357–58, 361–62, 367–68, 369–70, 371–72, 373–74, 377–78, 379–80, 381–82,  385–86, 393–94, 395–96, 397–98, 399–400, 401–02, 403–04, 405–06, 407–08, 419, 420, 422, 424, 433, 438–40, 441–43, 445–47, 448–50, 466–69, 470–73, 489–91, 527–28, 573–75.

[46]     *Id.* at 458–61, 462–65.

[47]     *Id.* at 271, 342–44, 357–58, 361–62, 367–68, 371–72, 373–74, 377–78, 381–82, 393–94, 399–400, 401–02, 403–04, 424, 433, 448–50, 458–61, 462–65, 470–73, 573–75, 619, 621–22.

[48]     *Id.* at 271, 279–81, 281–83, 295, 342–44, 357–58, 361–62, 367–68, 373–74, 377 –78, 383–84, 385–86, 387–88, 389–90, 391–92, 397–98, 401–02, 403–04, 405–06, 407–08, 433, 514, 524, 586, 573–75, 621–22, 682.

[49]     *Id.* at 361–62, 367–68, 373-74, 377–78, 433, 573–75.

ALJ considered the medical records in reference to Listing § 1.02A, this Court finds that there is insufficient evidence before it to meaningfully review the ALJ's determination that Wong does not meet or equal any listed impairment.  *See Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 823 (8th Cir. 2008); *Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005); *Pettit v. Apfel*, 218 F.3d 901, 903–04 (8th Cir. 2000); *Senne v. Apfel*, 198 F.3d 1065, 1068 (8th Cir. 1999).

In addition to EDS, the ALJ identified the following severe impairments: (1) POTS with chronic fatigue, (2) scoliosis, (3) spondylolisthesis, (4) hypertension, (5) hyperlipidemia, (6) lifelong chronic diarrhea of unknown cause, (7) chronic leukocytosis of unknown cause, and (8) bilateral ulnar neuropathy.  (*Id.* at 13–14.)  The ALJ did not explicitly consider any potentially relevant listings in relation to these severe impairments either.   Indeed, the ALJ's decision fails to mention, much less analyze, any specific listings in relation to this record.

The administrative hearing is not an adversarial proceeding.  *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994).  A plaintiff has the burden of proof to establish that he or she meets or equals a listed impairment.  *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530–31 (1990)).  The ALJ has a duty to fully develop record and that duty is independent of the claimant's burden to press his case.  *Scott*, 529 F.3d at 824 (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)).

In addition to the duty to fully develop the record, the ALJ must adequately explain his or her factual findings in order to permit the Court to determine whether substantial evidence supports the decision.  *See Scott*, 529 F.3d at 822 (citing *Chunn*, 397 F.3d at 672); *Pettit*, 218 F.3d at 903–04.  The Eighth Circuit consistently holds that "an ALJ's failure to adequately explain his factual findings is 'not a sufficient reason for setting aside an administrative finding' where the record supports the overall determination."  *Scott*, 529 F.3d at 822 (quoting *Senne*, 198

F.3d at 1067.  Remand is appropriate, however, where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit the Court to conclude that substantial evidence supports the Commissioner's decision.  *Id.*  In cases where the ALJ's factual findings are insufficient for meaningful appellate review, remand is appropriate.  *Chunn*, 397 F.3d at 672; *Pettit*, 218 F.3d at 903–04.

This Court has reviewed the record carefully and cannot conclude that substantial evidence on the record as a whole supports the ALJ's decision at step three.  *Hensley v. Barnhart*, 352 F.3d at 355.  The ALJ failed to include any explanation or reference to suggest which listings, if any, were considered in his decision.  In doing so, the ALJ failed to adequately support his finding at step three that Wong's impairments did not equal a listed impairment. *Scott*, 529 F.3d at 822 (citing *Chunn*, 397 F.3d at 672); *Pettit*, 218 F.3d at 903–04.  For these reasons, the Court recommends that the case be remanded to the ALJ to specifically determine whether Wong's severe medical impairments meet or medically equal any applicable listings.

IV.     **INSTRUCTIONS ON REMAND**

On remand, the ALJ should be directed to do the following:

First, consistent with his obligation to fully develop the record, the ALJ is instructed to obtain any relevant medical reports regarding Wong's treatment since the hearing on August 27, 2009.  *See, e.g.*, *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010).  The ALJ is instructed to give consideration to all medical reports in determining the appropriateness of Wong's alleged onset date and whether any of Wong's severe impairments met any listings during the relevant time period.  A heavy emphasis should be placed on Wong's medical records from the three years since the hearing.

Second, the ALJ shall fully analyze and explain whether the impairments he deems "severe" do or do not meet or equal any relevant listings.  In particular, the ALJ shall provide a detailed examination on whether Wong's EDS met or equaled Listing § 1.02A.

Third, if the ALJ finds that Wong's severe impairments do not meet or equal any relevant listings, he should determine Wong's RFC at step four in light of the updated record, paying particular attention to more recent medical records.  In evaluating Wong's subjective complaints of pain, the ALJ should give full consideration to any information obtained regarding treatment since the August 2009 hearing, in conjunction with the balance of the record.

Fourth, if, after considering the updated record, the ALJ concludes that the treating physicians' opinions and Wong's subjective complaints of disabling pain should be discounted, the ALJ should fully explain his position on those matters in light of the complete record.

Finally, the ALJ should solicit new testimony from a VE in order to determine whether there are any jobs Wong could perform given the ALJ's post-remand RFC determination.  *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

For the reasons discussed above, the Court concludes that the ALJ's decision to deny Wong's application for SSDI and SSI benefits cannot be upheld.  Therefore, it is recommended that the Commissioner's motion for summary judgment be denied and the ALJ's decision be vacated.  It is also recommended that Wong's motion for summary judgment be granted in part and denied in part. Wong's request for an immediate award of benefits should be denied.  To the extent Wong's motion requests remand, it is granted.

## V.    RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff Wong's Motion for Summary Judgment [Doc. No. 12] be **GRANTED as to remand**;

2.    Plaintiff Wong's Motion for Summary Judgment [Doc. No. 12] be **DENIED to the extent Plaintiff seeks reversal and outright award of benefits**;

3.    Defendant Commissioner's Motion for Summary Judgment [Doc. No. 15] be **DENIED**;

4.    This case be **REMANDED** to the Commissioner for further proceedings consistent with this Report & Recommendation pursuant to 42 U.S.C. § 405(g).

Dated: February 7, 2012


                                                    *s/ Steven E. Rau*
                                                    STEVEN E. RAU
                                                    United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 21, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.